# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MATTHEW LAMPE,                    )
                                 )
      Plaintiff,                    )
                                 )
      v.                            )      No. 4:16CV1202 JCH
                                 )
FEDERAL EXPRESS CORPORATION and   )
FREEMAN "JAKE" LOLLAR,            )
                                 )
      Defendants.                   )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, filed July 19, 2018. (ECF No. 46). The motion is fully briefed and ready for disposition.

## BACKGROUND

In 2005, Plaintiff Matthew Lampe was hired by Defendant Federal Express Corporation ("FedEx") as a Senior Global Vehicle Technician at the SUS Station in St. Louis, Missouri. (Defendants' Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment ("Defendants' Facts"), ¶ 3). At the SUS facility, Plaintiff worked the night shift. (*Id.*, ¶ 5). During his time there he received two purple spirit awards, for going above and beyond the call of duty. (*Id.*, ¶ 45).

At FedEx, Global Vehicle Technicians perform both general maintenance and preventive maintenance on vehicles in the fleet. (Defendants' Facts, ¶ 14).[1] In this position, Plaintiff was

---

[1] Preventive maintenance is maintenance performed on the vehicle to keep it in service and prevent it from breaking down. (Defendants' Facts, ¶ 15). It includes inspections and part replacement when necessary. (*Id.*). At least some preventive maintenance is mandated by the Department of Transportation ("DOT"), which requires an annual inspection on every piece of equipment owned and operated by FedEx. (*Id.*, ¶ 16 and Plaintiff's response thereto).

provided reference materials, including DOT regulations, maintenance requirements, maintenance procedures, and training materials. (*Id.*, ¶ 6). Plaintiff attended a number of training courses after his hiring, including training on particular vehicles used in the FedEx fleet, the use of Goodyear tires, and repairs to Cummins diesel engines. (*Id.*, ¶ 9). He completed one-on-one training with two separate Senior Global Vehicle Technicians, and further completed regular recurrent training courses throughout his employment with FedEx, which covered a myriad of topics including repairs to particular vehicles, fire extinguisher maintenance (and how to tell if one is full or empty), environmental training and disposal of vehicle waste oil, and maintenance of Goodyear tires. (*Id.*, ¶¶ 10-12).

During preventive maintenance inspections, maintenance technicians look at a variety of different parts and aspects of the vehicle, to ensure they comply with both FedEx and DOT standards and guidelines. (Defendants' Facts, ¶ 19). There are dozens of inspection points as part of each preventive maintenance inspection, and FedEx uses checklists to ensure all material required by the DOT is covered in the preventive maintenance inspection. (*Id.*, ¶¶ 18, 20).[2] Upon completion of a preventive maintenance inspection, vehicle technicians sign the preventive maintenance inspection report/check sheet, confirming and verifying the accuracy of the information included therein. (*Id.*, ¶ 21). Mr. Don McDougall, FedEx's corporate representative, testified that the assumption by FedEx was that if the vehicle technician checked off on the vehicle and signed the preventive maintenance inspection report/check sheet, then he had completed the work and the information contained on the document was accurate and valid.

---

[2] FedEx maintains the instructions available to the technician provide him with detail on what to inspect, when to inspect it, the order in which to inspect various aspects of the vehicle, and what specifically to look for with respect to each particular area of the vehicle. (Defendants' Facts, ¶ 24, citing Gibson Dep. 35:10-16). These instructions may be found, among other places, on the Global Vehicles SharePoint site and in the FedEx Express Global Vehicles Manual. (*Id.*, ¶¶ 28-30).

(*Id.*, ¶ 23, citing McDougall Dep. 77:11-14).

Vehicle technicians are instructed to perform their preventive maintenance inspections in order as identified on their preventive maintenance report, to maintain a balanced workload. (Defendants' Facts, ¶ 35, citing Lampe Dep. 89:14-17 and Lampe Dep. Exh. 5).[3] FedEx policy stated that if a vehicle technician's preventive maintenance workload became unbalanced, he or she was to contact his or her manager, which technicians in Lollar's organization did.[4]  (*Id.*, ¶ 36).[5]

Brakes are inspected during all preventive maintenance inspections, and as part of this process technicians are required to measure the friction material on the brake pad and note the thickness of the friction material on an inspection form.  (Defendants' Facts, ¶ 37).  In order to inspect the brakes, FedEx's written procedures instruct vehicle technicians to remove the tires and drums every time.  (*Id.*, ¶ 38).  Furthermore, to measure the friction material, FedEx's written procedures require technicians to use appropriate tools, calipers, and tread depth gauges to measure at the center of the shoe or pad.  (*Id.*, ¶ 39).  Despite these written requirements, Plaintiff admitted he did not always use a tool caliper or tread depth gauge to measure the

---

[3] Plaintiff maintains he informed his manager and other supervisors on a regular basis that his preventive maintenance workload had become unbalanced, and he therefore was unable to keep up with the workload on a timely basis because of his other responsibilities.  (Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment ("Plaintiff's Response to Defendants' Facts"), ¶ 35, citing Lampe Dep. 89:14-17, 135:11-137:21; Lampe Aff., ¶¶ 5-7).  Plaintiff asserts that as a result, he was concerned about the vehicles' safety.  (*Id.*).  FedEx counters Plaintiff admitted that within three months of his arrival at the ALN station, he had the fleet in serviceable condition, and that thereafter he had only the regular number of vehicles out of service.  (Defendants' Response to Plaintiff's Statement of Additional Material Facts that are Disputed ("Defendants' Response to Plaintiff's Facts"), ¶ 9; *see also* Lampe Dep. 111:12-16, 145:14-146:4).

[4] Freeman Lollar ("Lollar") was the District Fleet Manager to whom Plaintiff reported for the last 5-6 years of his employment with FedEx.  (Defendants' Facts, ¶ 4).

[5] Plaintiff admits concerns were raised, but maintains they were ignored or no changes were made.  (Plaintiff's Response to Defendants' Facts, ¶ 36).

friction material on the shoe or pad during his preventive maintenance inspections. (*Id.*, ¶ 40).[6]

According to FedEx maintenance policy, brake pads on a W-Series Diesel vehicle must have a minimum of one-quarter inch of usable friction material. (Defendants' Facts, ¶ 41). This requirement was in excess of what was required by the State of Missouri, which required only that brake pads be changed at 2/32 of an inch. (*Id.*, ¶ 42). Plaintiff was never disciplined for replacing tires on a FedEx vehicle too soon, nor is he aware of any employee receiving a warning letter, performance reminder, or documents counseling ("OLCC") for doing so. (*Id.*, ¶¶ 43-44).

In approximately 2014, Plaintiff bid on, applied for, and was offered a day shift position at the ALN facility in Earth City, Missouri. (Defendants' Facts, ¶ 46). While both SUS and ALN are pickup and delivery locations, ALN is larger and busier than SUS, and has between 70 and 80 vehicles in its fleet. (*Id.*, ¶¶ 47-48). Furthermore, there are a number of additional responsibilities associated with a day shift position versus night shift manager. (*Id.*, ¶ 49).

Within five or six days of starting work at ALN, Plaintiff began informing his manager that many of the vehicles for which he was responsible were coming into the station with bald tires. (Defendants' Facts, ¶ 52).[7] In response to each of Plaintiff's complaints, Lollar told him to replace the unsafe tires, and went so far as to inform Plaintiff he would be disciplined if he allowed a vehicle to go on the road with tires in an unsafe condition. (*Id.*, ¶¶ 55, 56). Lollar also informed Plaintiff that he had the right and the responsibility to stop any truck from going out on the road in an unsafe condition, and the authority to pull as many vehicles as he deemed unsafe. (*Id.*, ¶¶ 57-58). Plaintiff pulled 18 trucks out of service the very next day, and from that point

---

[6] Plaintiff acknowledges the written procedures, but denies they reflected the actual practice of FedEx mechanics. (Plaintiff's Response to Defendants' Facts, ¶¶ 38-40). Plaintiff further maintains the mechanics' routine visual inspections of the brakes were known and approved by FedEx supervisor Lollar. (*Id.*).

[7] It was Plaintiff's job to ensure the vehicles for which he was responsible were in a safe condition, and to replace tires on those vehicles as necessary. (Defendants' Facts, ¶ 54).

forward, whenever Plaintiff determined a vehicle had tires in a condition that was unsafe or unroadworthy, he pulled the vehicle out of service. (*Id.*, ¶¶ 60, 61). Plaintiff was never disciplined in any way for pulling a vehicle out of service due to the condition of its tires. (*Id.*, ¶ 62).[8]

Plaintiff also began complaining to Lollar about the general mechanical condition of the vehicles at the ALN station on the first day he arrived, and continued to do so throughout his tenure working at the facility. (Defendants' Facts, ¶¶ 72-73). Plaintiff made approximately 100 complaints to Lollar about the general mechanical condition of the vehicles, and his inability to keep the fleet maintained with only two technicians. (*Id.*, ¶ 74). In response to these complaints, Lollar instructed Plaintiff to fix the vehicles, and asked what he could do to help. (*Id.*, ¶ 76, citing Lampe Dep. 135:21-24; Lollar Dep. 106:21-107:3). Although Lollar did at times send mechanics from other facilities to assist with the workload at ALN, Plaintiff denies he provided adequate assistance or help. (*Id.*, ¶¶ 76-77 and Plaintiff's response thereto).

Plaintiff complained to Lollar's immediate supervisor, Senior Manager Don Miller ("Miller"), repeating the complaints he had made to Lollar. (Defendants' Facts, ¶ 80). In early February, 2015, Miller met with Plaintiff and Lollar at the ALN facility, to discuss Plaintiff's concerns. (*Id.*, ¶ 81). During the approximately three hours long meeting, Plaintiff told Miller and Lollar that several units were in need of repair, and there were a number of tires that needed to be replaced. (*Id.*, ¶¶ 81-82). Miller instructed Plaintiff to do the best he could to fix the

_____

[8] Plaintiff acknowledges the above events. He maintains that despite his expressions of concern to Lollar, however, he was provided no support or assistance to address the safety concerns and assure that all vehicles placed in service were safe for the drivers and the public at large. (Plaintiff's Response to Defendants' Facts, ¶¶ 55-62). As a result, Plaintiff maintains vehicles were processed more slowly that Lollar demanded, and Plaintiff was chastised and pressured to work faster. (*Id.*).

trucks. (*Id.*, ¶¶ 83, 85).[9] While Plaintiff was never disciplined or punished for being unable to fix a vehicle, or for keeping it out of service, he asserts he was threatened with discipline, including termination. (*Id.*, ¶ 86, and Plaintiff's response thereto). By April of 2014, approximately three to four months after he began working at the ALN facility, Plaintiff was able to bring the fleet back to a serviceable condition. (*Id.*, ¶¶ 87-88).

In December, 2014, Plaintiff received a Bravo Zulu ("BZ"), and an accompanying $100 bonus grant, for going above and beyond the call of duty in keeping trucks in service during peak periods. (Defendants' Facts, ¶ 90). Plaintiff received the BZ award after his complaints to Lollar about bald tires, after his complaints to Lollar about the general mechanical condition of the trucks, and after he contacted Mr. Neil Gibson ("Gibson"), FedEx's Managing Director of US Vehicle Maintenance.[10] (*Id.*, ¶ 92).

As of February 19, 2015, FedEx Vehicle Asset Number 226278, a Freightliner W700 box truck, had been out of service at the ALN location for approximately 30 days. (Defendants' Facts, ¶¶ 106-107). The vehicle required replacement of a BP44 injection pump. (*Id.*, ¶ 106). Plaintiff had attempted to repair the BP44 injection pump, even though he was not trained to do so, but was unsuccessful. (*Id.*, ¶ 108 and Plaintiff's response thereto; Lampe Dep. 148:22-149:6). On February 19, 2015, Lollar sent Plaintiff an email asking about the vehicle's status, and inquiring as to whether Plaintiff needed assistance in getting it repaired and back into

---

[9] Plaintiff maintains he was unable adequately to repair the trucks, because Lollar failed to provide him with the necessary support to complete same. (Plaintiff's Response to Defendants' Facts, ¶¶ 83, 85).

[10] Plaintiff complained to Gibson in September of 2014 that the vehicle technician at ALNA prior to Plaintiff did a poor job, and that Lollar covered it up. (Defendants' Facts, ¶ 66). Plaintiff also told Gibson he believed Lollar was "coming after [Plaintiff's] job." (*Id.*, ¶ 68, quoting Lampe Dep. 140:4-23). Gibson responded that he would check with human resources to determine what was going on, but Plaintiff denies that any action on Gibson's part resulted in changes or improvements. (*Id.*, ¶ 69 and Plaintiff's response thereto).

service.  (*Id.*, ¶ 111).  Lollar offered to have the vehicle taken to another facility, to be repaired by a different mechanic, and Plaintiff agreed.  (*Id.*, ¶¶ 113, 114).  Lollar then contacted Robert Cupp ("Cupp"), to ask if he had the time and ability to fix the injection pump on vehicle 226278. (*Id.*, ¶ 115).  On February 23, 2015, the vehicle was towed from the ALN facility to the STLR facility (where Cupp was located), and Cupp completed  the repair.  (*Id.*, ¶¶ 116-117).

Prior to vehicle 226278 being towed to the STLR facility, Plaintiff performed a preventive maintenance inspection on the vehicle.  (Defendants' Facts, ¶ 119).  Plaintiff testified during his deposition that he rushed through the preventive maintenance inspection, and did not spend as much time on it as he normally would, because he was under a lot of stress.  (*Id.*, ¶ 120, citing Lampe Dep. 182:1-23 and Lampe Dep. Exh. 10).  Plaintiff further testified that, "If you rush things, you're going to make mistakes", (*see Id.*), and stated he was sure he made mistakes when completing the preventive maintenance inspection report on vehicle number 226278.  (*Id.*, ¶ 122, citing Lampe Dep. 185:6-13 and Lampe Dep. Exh. 12).  In an affidavit submitted with his response to the instant motion, however, Plaintiff now denies he made any mistakes on the preventive maintenance inspection report at issue in this lawsuit.  (Plaintiff's Response to Defendants' Facts, ¶¶ 121, 122, citing Lampe Aff., ¶¶ 4-26; *see also* Lampe Aff., ¶ 22 ("When I was initially confronted with a potential mistake I may have made regarding the depth of the brake pad, I did admit I may have made a mistake.  This was my initial reaction because I take responsibility for my work and my reports and take ownership for them.  However, upon further reflection, I now believe my report was accurate and the brake pad was worn down when it was towed.")).

On the preventive maintenance inspection report at issue, Plaintiff recorded friction

material thicknesses of 9/32 of an inch[11] for both front brake pads on vehicle 226278, and indicated the brakes were acceptable under FedEx standards and no repairs were required. (Defendants' Facts, ¶ 123). Plaintiff admits that in measuring the brake friction material, he did not use a tool caliper or depth gauge, nor did he remove the vehicle's tire as required by FedEx policy; instead, he visually inspected it by turning the wheel until he could shine a flashlight through a hole to look through. (*Id.*, ¶ 125).[12]

Once the vehicle arrived at the STLR facility, Cupp raised the front vehicle off the ground and put it on stands to gain access to the work area. (Defendants' Facts, ¶ 128). After removing the front left wheel to gain access to the area where the injector pump was to be replaced, he noticed that the brake pad on the wheel was beyond wear limits under FedEx policy. (*Id.*, ¶ 130).[13] Cupp therefore changed both front brake pads on vehicle 226278, noticing in the process that the front right brake pad was within FedEx's specifications. (*Id.*, ¶ 131). While Plaintiff admits vehicle 226278 had not been on the road or in service since he performed the preventive maintenance inspection on January 27, 2015, he maintains it was towed to the STLR facility with the back end up and the front wheels on the ground rolling in reverse, which Plaintiff asserts can wear down the brake pads. (*Id.*, ¶ 132 and Plaintiff's response thereto, citing

---

[11] This thickness was significant, because had Plaintiff recorded the brake friction material as 8/32 of an inch (or ¼ of an inch) or lower, FedEx procedures required him to change the brake pad. (Defendants' Facts, ¶ 124).

[12] Plaintiff submits it was common practice for FedEx mechanics to determine from a visual inspection whether a brake pad was of sufficient thickness to be safely driven, and further that Lollar and other managers and supervisors knew of and condoned the practice. (Plaintiff's Response to Defendants' Facts, ¶ 125). Cupp conversely testified that he was unable to determine whether the friction material on a brake pad was ¼ of an inch or greater from a visual inspection. (Defendants' Facts, ¶ 133, citing Cupp. Dep. 84:25-85:6).

[13] In fact, Cupp testified that the pad was "worn metal to metal." (Cupp. Dep. 81:1).

Lampe Aff., ¶ 18).[14]

Upon making the discovery with respect to the left front brake pad Cupp contacted Lollar, who contacted Miller. (Defendants' Facts, ¶¶ 134-135). Miller instructed Lollar to go to the STLR facility to inspect the vehicle. (*Id.*, ¶ 135). When Lollar did so, he determined that the brake caliper had failed, causing the pads to wear out. (*Id.*, ¶ 136).[15] Lollar then performed a full inspection of the vehicle, essentially auditing the preventive maintenance inspection report completed by Plaintiff on January 27, 2015, and discovered the following inaccuracies: all brake friction measurements were incorrectly recorded; the rear breather element was completely covered with grease and debris despite being noted as acceptable; the driver's seat mount was cracked despite nothing being noted on the preventive maintenance inspection report/check sheet; the fire extinguisher was empty and its pin was missing; the foot pedal return spring was missing; and all of the tire pressure readings on the preventive maintenance report were incorrect. (*Id.*, ¶¶ 137-138).[16] Lollar took the brake pads to Plaintiff's facility and asked if they were the pads from vehicle 226278, to which Plaintiff responded they probably were. (*Id.*, ¶ 139).[17] Plaintiff further confirmed that he had rushed through the inspection on vehicle 226278, and that he probably had also rushed through the inspections of other vehicles as well. (*Id.*, ¶¶

---

[14] Although Plaintiff makes this assertion, Defendants note he testified that once the vehicle left ALNA, Plaintiff had no knowledge of what happened to it. (Defendants' Facts, ¶ 127, citing Lampe Dep. 181:3-10, 191:25-192:5, 256:11-14).

[15] Again, Plaintiff maintains that when a brake caliper fails and the vehicle is towed incorrectly or in reverse, it can result in the brake pads wearing down. (Plaintiff's Response to Defendants' Facts, ¶ 136).

[16] Plaintiff denies inaccurately recording any of these items on his preventive maintenance report, and further denies any of these problems existed when the vehicle was last driven. (Plaintiff's Response to Defendants' Facts, ¶ 138, citing Lampe Aff., ¶¶ 15-26; Plaintiff's Statement of Additional Material Facts that are Disputed, ¶¶ 34-39).

[17] Despite this contemporaneous confirmation, Plaintiff now maintains he does not know if they were the brakes from vehicle 226278, because there were no identifying numbers to confirm same. (Lampe Aff., ¶ 23).

140, 141).[18]

On February 27, 2015, Lollar both called and emailed Plaintiff, requesting a statement as to why there were discrepancies between the preventive maintenance inspection report/check sheet and the actual condition of the vehicle. (Defendants' Facts, ¶¶ 142, 143). Plaintiff provided a statement within an hour of receiving Lollar's email request, stating as follows: "I was under a lot of pressure to get that truck back into service and it was the end of the month and I still had five or six other pms due so I pulled it over and threw it on the rack and done a fast pm on it. I measured the outside pad on the brakes[. W]ith all the stress I have been put under I am bound to make mistakes. I believe I also had nine or eleven truck oos at the same time so there was a lot of pressure to get things done." (Lampe Dep. Exh. 10).[19] The next day Miller, Lollar and Mary Davin (the human resources advisor assigned to the facility) placed Plaintiff on an investigative suspension with pay. (Defendants' Facts, ¶¶ 145, 147).[20]

Investigations are conducted on a case-by-case basis, as a number of variables contribute to the final decision. (Defendants' Facts, ¶ 149). Here, Lollar performed most of the investigative work, and provided the relevant materials to Miller for review. (*Id.*, ¶ 148). Lollar testified that as part of his investigation, he reviewed other preventive maintenance inspection reports completed by Plaintiff, and discovered Plaintiff had included incorrect information

---

[18] Again, while Plaintiff admits rushing through inspections, he denies incorrectly or inaccurately reporting anything on the inspection reports. (Plaintiff's Response to Defendants' Facts, ¶¶ 140, 141).

[19] As noted above, Plaintiff admits initially stating this but now denies that he incorrectly or inaccurately reported anything on the inspection report at issue. (Plaintiff's Response to Defendants' Facts, ¶ 144).

[20] Defendants assert that whenever incorrect information is discovered on a preventive maintenance inspection report, FedEx human resources personnel work closely with front line management to complete an investigation into the incident. (Defendants' Facts, ¶ 146). Plaintiff counters that while that may be the case, here Lollar simply was looking for an opportunity to terminate Plaintiff's employment in response to Plaintiff's voicing concerns about vehicles being put on the road that were not safe. (Plaintiff's Response to Defendants' Facts, ¶ 146).

regarding two to three other vehicles.  (*Id.*, ¶¶ 152-153, citing Lollar Dep. 76:6-25).

Approximately one month later, after FedEx completed its investigation, Miller instructed Lollar to terminate Plaintiff's employment.  (Defendants' Facts, ¶ 154).  Defendants maintain the decision was based on the information obtained during the investigation, the circumstances surrounding the incident, Plaintiff's statement, and the number and egregious nature of the discrepancies.  (*Id.*).  Specifically, McDougall testified that the size of the discrepancy between what Plaintiff reported and what Lollar later found, *i.e.*, 9/32nds of an inch thickness versus 0-1/32nd of an inch, contributed to Defendants' conclusion that Plaintiff deliberately falsified the report.  (*Id.*, ¶ 155).  Plaintiff counters that Defendants' explanation is pretextual, and designed to disguise the true motive for his firing, "for blowing the whistle on Mr. Lollar's failure to provide adequate resources for Matthew Lampe to complete his work in a safe and timely manner and for complaining and expressing these concerns to Mr. Lollar's supervisors or superiors."  (Plaintiff's Response to Defendants' Fact, ¶¶ 154-155, citing Lampe Aff., ¶¶ 17-26).  Plaintiff was given a termination letter on April 2, 2015, informing him that his employment was being terminated because the findings concluded he had falsified the FedEx Preventive Maintenance regulatory check sheet, and said falsification could lead to fines or sanctions against FedEx.  (Defendants' Facts, ¶ 157, citing Lampe Dep. 174:22-175:19; Lampe Dep. Exh. 11).

Plaintiff appealed his termination through the FedEx appeal process, also known as the Guaranteed Fair Treatment Procedure ("GFTP").  (Defendants' Facts, ¶ 172).  The GFTP is a three-step process, as follows:  managing director review at step one, officer review at step two, and review by the FedEx Appeals Board at step three.  (*Id.*, ¶ 173).[21]  Plaintiff appealed through

---

[21] The human resources advisor assigned to the area advises management of the policies and procedures applicable to the employee's situation, consults with management on what options

all three steps of the GFTP process, and as part of his appeal, he provided a written statement/narrative explaining his position. (*Id.*, ¶¶ 176, 180). In his statement, Plaintiff stated he was under a large amount of stress, and "made mistakes due to the stress and no help." (*Id.*, ¶¶ 181, 182, citing Lampe Dep. 180:10-18; Lampe Dep. Exh. 12).[22]

Because Plaintiff mentioned Gibson by name in his GFTP complaint, Gibson did not participate in the appeal process; instead, his peer Managing Director, Jimmy Mathis ("Mathis") reviewed the file and upheld the decision to terminate Plaintiff. (Defendants' Facts, ¶ 177). Plaintiff acknowledged that prior to the GFTP he knew nothing about Mathis, other than that "he was real high up in vehicle maintenance." (*Id.*, ¶ 178, quoting Lampe Dep. 226:23-25). Plaintiff testified he had no reason to believe any member of the FedEx Appeals Board had reason to retaliate against him, and the decision to terminate Plaintiff was upheld at all three steps of the GFTP appeals process. (*Id.*, ¶¶ 179, 184).

On or about May 29, 2016, Plaintiff filed a Petition in the Circuit Court of St. Louis County, Missouri, asserting one count of Wrongful Discharge in Violation of Public Policy (Whistleblowing). (ECF No. 3). FedEx removed the case to this Court on July 21, 2016, on the basis of diversity jurisdiction. (ECF No. 1). As noted above, Defendants filed the instant Motion for Summary Judgment on July 19, 2018, asserting there exist no genuine disputes as to the material facts, and Defendants are entitled to judgment as a matter of law. (ECF No. 46).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[22] may be available, and acts as a liaison between management and the employee throughout the process. (Defendants' Facts, ¶¶ 174-175).

As noted above, Plaintiff claims he was under stress due to Defendants' failure to provide adequate resources and assistance. (Plaintiff's Response to Defendants' Facts, ¶¶ 181-182).

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

As noted above, in his Complaint Plaintiff asserts one count of Wrongful Discharge in Violation of Public Policy (Whistleblowing). Under Missouri law, "[a]bsent an employment contract with a definite statement of duration…an employment at will is created." *Margiotta v. Christian Hosp. Northeast Northwest*, 315 S.W.3d 342, 345 (Mo. banc 2010) (internal quotations and citations omitted). Generally, an employer may terminate an at-will employee for any reason or no reason at all. *Id.* There are exceptions to the at-will employment doctrine, however. *Farrow v. Saint Francis Medical Center*, 407 S.W.3d 579, 595 (Mo. banc 2013). As

relevant here, the Missouri Supreme Court has adopted the following public policy exception to the at-will employment doctrine:

> An at-will employee may not be terminated…. (2) for reporting wrongdoing or violations of law to superiors or public authorities….If an employer terminates an employee for [this] reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception.

*Id.* (quoting *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010)).

The public policy exception to the at-will employment rule is very narrowly drawn, and "[i]t is well-settled that public policy is not found in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they themselves believe to be the demands or interests of the public." *Margiotta*, 315 S.W.3d at 346 (internal quotations and citation omitted). Rather, "a wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." *Id.* (citation omitted). "Absent such explicit authority, the wrongful discharge action fails as a matter of law." *Id.* (citation omitted).

Not every statute or regulation may give rise to an at-will wrongful discharge action. *Margiotta*, 315 S.W.3d at 346.

> A vague or general statute, regulation, or rule cannot be successfully pled under the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires. Such vagueness would also cause the duties imposed upon employers [to] become more vague and create difficulties for employers to plan around liability based on the vagaries of judges.

*Id.* (internal quotations and citations omitted).[23]

---

[23] "[A] plaintiff need not rely on an employer's *direct* violation of a statute or regulation." *Fleshner*, 304 S.W.3d at 96 (citation omitted). "Instead, the public policy must be *reflected by* a constitutional provision, statute, regulation promulgated pursuant to statute, or a rule created by a governmental body." *Id.* (citation omitted).

"Subject to these parameters, Missouri's public-policy exception protects an employee who reports legal violations or wrongdoing to superiors or third parties ('whistleblowing')", and an employee terminated for this reason has a common-law tort action for wrongful discharge. *Yerra v. Mercy Clinic Springfield Communities*, 536 S.W.3d 348, 351 (Mo. App. 2017) (citations omitted).  To establish such a claim, "a whistleblower plaintiff must demonstrate that:  (1) [he] reported serious misconduct that constituted a violation of the law and of well-established and clearly-mandated public policy; (2) [his] employer discharged [him]; and (3) [his] report causally contributed to the discharge."  *Id.* (citation omitted).  *See also Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 103 (Mo. banc 2010).

In their Motion to Dismiss, Defendants assert Plaintiff never reported wrongdoing or violations of the law to his superiors or third parties, and thus he lacks the necessary protected activity to underlie a wrongful discharge claim.  (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defendants' Memo in Support"), PP. 5-9).  Defendants further maintain that even assuming Plaintiff participated in protected conduct, his termination was based solely on a legitimate, non-retaliatory basis.  (*Id.*, PP. 9-12).  Because it is dispositive, the Court addresses only the latter contention.

As support for their position that Plaintiff was terminated solely because he falsified a company regulatory document that could subject FedEx to fines and sanctions, Defendants outline the sequence of events at issue.  They first note that although Plaintiff began complaining about the bald tires on the vehicles for which he was responsible within five or six days of starting work at ALN, and made approximately 100 complaints to Lollar about the general mechanical condition of the vehicles (beginning on his first day of work), he nevertheless was awarded a BZ and accompanying $100 bonus grant in December, 2014, months after his

complaints began. (Defendants' Memo in Support, P. 10).

Defendants next cite to the thoroughness of FedEx's investigation into Plaintiff's alleged wrongdoing, and the uniformity of the evidence uncovered and the conclusions reached. Specifically, Defendants emphasize that, although Plaintiff recorded friction material thicknesses of 9/32 of an inch for both front brake pads on vehicle 226278 on the preventive maintenance inspection report at issue, and indicated the brakes were acceptable under FedEx standards and no repairs were required, upon its arrival at the STLR facility Cupp noticed that the brake pad on the front left wheel was beyond wear limits under FedEx policy, "worn metal to metal". Cupp immediately notified Lollar, who then (on instruction from Miller) personally inspected the vehicle and discovered the following inaccuracies: all brake friction measurements were incorrectly recorded; the rear breather element was completely covered with grease and debris despite being noted as acceptable; the driver's seat mount was cracked despite nothing being noted on the preventive maintenance inspection report/check sheet; the fire extinguisher was empty and its pin was missing; the foot pedal return spring was missing; and all of the tire pressure readings on the preventive maintenance report were incorrect.

Lollar took his concerns directly to Plaintiff, who confirmed the probable identity of the brake pads, and further admitted he had rushed through the inspection on vehicle 226278 (and most likely on the inspections of other vehicles as well). Plaintiff reiterated his position in an email exchange on February 27, 2015, stating as follows: "I was under a lot of pressure to get that truck back into service and it was the end of the month and I still had five or six other pms due so I pulled it over and threw it on the rack and done a fast pm on it. I measured the outside pad on the brakes[. W]ith all the stress I have been put under I am bound to make mistakes. I believe I also had nine or eleven truck oos at the same time so there was a lot of pressure to get

things done." (Lampe Dep. Exh. 10).[24]

Despite this admission, rather than terminate Plaintiff immediately FedEx suspended him with pay, and launched an investigation into the matter. As part of its month-long investigation, Lollar reviewed other preventive maintenance inspection reports completed by Plaintiff, and discovered Plaintiff had included incorrect information regarding two to three other vehicles. The investigators considered this fact, together with information regarding what actions had been taken against employees in the past who had committed the same act of falsification. (*See* Don Miller Sworn Statement to US Department of Labor (OSHA), P. 7). Miller eventually instructed Lollar to terminate Plaintiff's employment, because the information obtained during the investigation demonstrated Plaintiff had falsified the FedEx Preventive Maintenance regulatory check sheet, and said falsification could lead to fines or sanctions against FedEx.[25]

Plaintiff then appealed his termination through the FedEx GFTP, and as part of his appeal he provided a written statement/narrative explaining his position. Again, in his statement Plaintiff acknowledged he was under a large amount of stress, and "made mistakes due to the stress and no help." (*See* Lampe Dep. 180:10-18; Lampe Dep. Exh. 12). The decision to terminate Plaintiff's employment was upheld at all three steps of the GFTP appeals process,

---

[24] Plaintiff testified consistently with this position during his deposition, stating that he rushed through the preventive maintenance inspection, and did not spend as much time on it as he normally would, because he was under a lot of stress. (Lampe Dep. 182:1-23). Plaintiff further testified that, "If you rush things, you're going to make mistakes", (*see Id.*), and stated he was sure he made mistakes when completing the preventive maintenance inspection report on vehicle number 226278. (Lampe Dep. 185:6-13).

[25] It is undisputed that falsification of a regulatory document that could subject FedEx to fines or other sanctions is a "discharge offense" pursuant to FedEx's Acceptable Conduct Policy. (*See* Lampe Dep. Exh. 7). Plaintiff admits that he knew falsification often resulted in termination at FedEx; that he was aware of other employees being terminated for falsification; that he was not aware of any FedEx maintenance employee who recorded the wrong thickness for the brake friction material on a preventive maintenance inspection form and was not terminated; and that in fact under FedEx policy technicians were always terminated for falsifying FedEx documents related to preventive maintenance. (Defendants' Facts, ¶¶ 166, 167, 170).

despite the fact that Plaintiff admits he never reported problems with the ALN fleet to Mathis, the peer Managing Director who reviewed the case, nor did he have reason to suspect anyone on the Appeals Board intended to discriminate against him.

In his response to Defendants' motion, Plaintiff attempts to create genuine issues of material fact with respect to the foregoing. For example, despite admitting that the preventive maintenance inspection report shown to him at his deposition had a DOT identifying number on it, Plaintiff denies being aware that all preventive maintenance inspection reports had such a number, or that all such reports were sent to the DOT. (Plaintiff's Facts, ¶¶ 2, 3). FedEx counters that Gibson, FedEx's Managing Director of US Vehicle Maintenance, testified the preventive maintenance form at issue here was a FedEx version of the DOT requirements (Gibson Dep. 37:3-7), and that while such preventive maintenance records are not required to be sent to the DOT, Federal Motor Carrier Safety Administration regulations require that they be maintained by FedEx and presented to regulatory officials upon demand. (*See* Defendants' Response to Plaintiff's Facts, ¶¶ 2, 3; Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment, PP. 4-8).

Next, in an affidavit sworn to by Plaintiff on August 15, 2018, and submitted with his response to the instant motion, Plaintiff now denies that he made any mistakes on the preventive maintenance inspection report at issue in this lawsuit. (*See* Lampe Aff., ¶¶ 4-26). With respect to the brake pads, Plaintiff asserts as follows: "When I was initially confronted with a potential mistake I may have made regarding the depth of the brake pad, I did admit I may have made a mistake. This was my initial reaction because I take responsibility for my work and my reports and take ownership for them. However, upon further reflection, I now believe my report was

accurate and the brake pad was worn down when it was towed." (*See* Lampe Aff., ¶ 22).[26] Plaintiff also contends he does not know if the worn brakes he was shown were even from vehicle 226278, because there were no identifying numbers to confirm same. (Lampe Aff., ¶ 23). He does so, however, after having informed Lollar during the initial investigation that they most likely were the same brake pads.

With respect to the other alleged inaccuracies on his preventive maintenance report, Plaintiff denies any of those problems existed when the vehicle was last driven. As support for this contention Plaintiff provides an affidavit from his daughter, Ms. Jessica Lampe, in which she attests that she was the last person to drive vehicle number 226278 before it was put out of service for repairs; that she did not notice any problems with the brakes when she last drove the vehicle; that the driver's seat was not cracked or broken; that the foot pedal was working fine; that there were no problems with the tire pressure; and that she was required to check those items daily before using the vehicle for her delivery route. (Jessica Lampe Aff., ¶¶ 5-10).

Upon consideration, the Court finds the alleged conflicts presented by the two Lampe affidavits insufficient to create a genuine issue as to any material fact. With respect to Plaintiff, the Court notes that prior to filing his affidavit in response to Defendants' Motion for Summary Judgment, Plaintiff's position was clear and consistent. In other words, when Lollar initially raised his concerns regarding the brake pads with Plaintiff, Plaintiff admitted he had rushed through the inspection on vehicle 226278, and that he probably had made mistakes. (*See* Lampe Dep. Exh. 10). Plaintiff reiterated this during his deposition (*see* Lampe Dep. 182:1-23, 185:6-

---

[26] As stated above, Plaintiff now maintains the vehicle was towed to the STLR facility with the back wheels lifted and the front wheels on the ground rolling in reverse, a process which Plaintiff asserts can wear down the brake pads. (Lampe Aff., ¶ 18). Plaintiff makes this assertion despite having previously testified that once the vehicle left ALNA, he had no knowledge of what happened to it. (*See* Lampe Dep. 181:3-10, 191:25-192:5, 256:11-14).

13), and in the written statement he provided when appealing his termination (*see* Lampe Dep. 180:10-18; Lampe Dep. Exh. 12). The Eighth Circuit does "not permit a post-deposition affidavit to contradict prior testimony in an attempt to create issues of fact." *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 818 (8th Cir. 2015) (citing *Popoalii v. Corr. Med.Servs.*, 512 F.3d 488, 498 (8th Cir. 2008) ("We have held that '[i]f testimony under oath…can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment. A party should not be allowed to create issues of credibility by contradicting his own earlier testimony.'") (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)).[27] *See also Camfield*, 719 F.2d at 1365 (citation omitted) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Frevert v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010) (same).

With respect to Jessica Lampe's affidavit, the Court agrees with Defendants that it may not be considered. The Federal Rules of Civil Procedure require parties initially to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information….that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."[28] Fed.R.Civ.P. 26(a)(1)(A). Furthermore, each party has a duty to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect," if such additional

---

[27] An affidavit may be submitted to clarity ambiguities or confusion in deposition testimony, *see Taylor*, 795 F.3d at 818, but such is not the case here.

[28] Plaintiff attempts to characterize Ms. Lampe's testimony as impeachment evidence. Upon consideration, however, the Court finds that while that may be so, her testimony is also substantive and thus subject to the strictures of Rule 26.

information has not already been made known to the other parties during the discovery process. Fed.R.Civ.P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion…unless the failure was substantially justified or harmless." Fed.R.Civ.P. 37(c)(1).

Here, Jessica Lampe was not properly disclosed under Rule 26(a) or (e); instead, her affidavit was submitted expressly for the purpose of opposing summary judgment. The Court finds no evidence the failure was substantially justified, as Plaintiff himself mentioned during his deposition that his daughter drove the vehicle at issue, thereby acknowledging before the close of discovery his familiarity with the witness and her possession of potentially relevant information. The Court further finds the failure to disclose Ms. Lampe was harmful to Defendants, as they did not have the opportunity to depose the witness or consider her testimony in preparing their dispositive motion. *See Hinesley v. City of Lake Ozark, Mo.*, 2010 WL 3613996, at *3 (W.D. Mo. Sep. 8, 2010). The Court thus declines to consider the affidavit in deciding the instant motion.

Finally, as further support for its ruling, the Court notes that its decision would be the same even if it were to consider the two affidavits. As noted above, the question before the Court is whether Plaintiff's alleged reporting of serious misconduct causally contributed to his discharge. FedEx ably demonstrated that Plaintiff's termination was based solely on a legitimate, non-retaliatory basis, *i.e.*, its finding that Plaintiff falsely recorded the friction material thickness of the front brake pads on vehicle 226278. Plaintiff himself admits that he had been counseled on multiple occasions about the importance of accurate paperwork (*see* Defendants' Facts, ¶ 162), and that other technicians were fired for the same offense.

(Defendants' Facts, ¶ 166).  Plaintiff's after-the-fact assertion that the brake pads were worn down due to improper towing was not before the investigators; instead, they were privy only to Plaintiff's admissions that he had rushed the inspection and made mistakes on the preventive maintenance report.  FedEx relied on the information it received from Plaintiff and others during its investigation, and properly concluded his conduct constituted a discharge offense under FedEx's Acceptable Conduct Policy.  Under these circumstances, Defendants' Motion for Summary Judgment must be granted.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 46) is **GRANTED**, and Plaintiff's Complaint is **DISMISSED** with prejudice.  An appropriate Judgment will accompany this Memorandum and Order.

Dated this 25th Day of September, 2018.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE